# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JANE ROE,<br><br>　　　　Plaintiff,<br><br>v.<br><br>THE STATE OF OKLAHOMA *ex rel* UNIVERSITY OF CENTRAL OKLAHOMA;<br><br>　　　　Defendant. | §<br>§<br>§<br>§<br>§<br>§　Case No.: CIV-22-237-SLP<br>§<br>§<br>§<br>§<br>§<br>§ |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff Jane Roe and hereby files this Original Complaint and for cause of action would show this Court and Jury as follows:

## PARTIES

1. Plaintiff Jane Roe ("Roe") is an individual who, at the time of the sexual assault and gender discrimination complained of herein, was a student attending the University of Central Oklahoma. Roe maintains an F-1 Student Visa and is a non-resident alien in the state of Oklahoma.

2. Defendant State of Oklahoma *ex. rel.* University of Central Oklahoma ("UCO" or "the University") is an institution of higher education located in Oklahoma County, Oklahoma.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction of all civil actions arising under the Constitution, laws and treaties of the United States, 42 U.S.C. § 1988.

4. Venue in this Court is proper under 28 U.S.C. § 1391 (b) because the events giving rise to this claim took place in this judicial district, and Defendant resides in this judicial district.

## GENERAL ALLEGATIONS

### The Legal Framework

5. At all relevant times, UCO received federal funding for its academic programs and activities and was subject to the requirements of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 ("Title IX").

6. Title IX protects persons from discrimination "on the basis of sex," which includes protection from sexual harassment and sexual harassment.

7. The Title IX Regulations provide that "[n]o recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title IX… or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part." 34 C.F.R. § 106.71.

8. In 2001, The Department of Education ("DOE"), published the *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512, Jan. 19, 2001. ("2001 Guidance").

9. The 2001 Guidance, "…focuses on a school's fundamental compliance responsibilities.

under Title IX…."

10. The 2001 Guidance notes that "due to the power a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student."

11. The 2001 Guidance explains that "[Federal funds] recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees" and is therefore responsible for an employee's harassment or discriminatory conduct when the employee is carrying out these responsibilities. "The recipient, therefore, is also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence. This is true whether or not the recipient has 'notice' of the harassment."

12. The 2001 Guidance acknowledges that, "Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination."

13. It goes on to state, "These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by the Title IX regulations. *By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, <u>a school is telling its students that it does not tolerate sexual harassment</u> and that students can report it without fear of adverse consequences."*

14. The 2001 Guidance recognizes that, "training for administrators, teachers, and staff and age-appropriate classroom information for students can help ensure that they understand

3

what types of conduct can cause sexual harassment and that they know how to respond."

15. The 2001 Guidance requires that a school's sexual misconduct policies be widely disseminated. To that end, "Distributing the procedures to administrators, or including them in the school's administrative policy manual may not by itself be an effective way of providing notice."

16. In April 2011, the Department of Education, Office for Civil Rights ("OCR") issued a Dear Colleague Letter ("DCL") as a "significant guidance document" to "provide funding recipients with information to assist them in meeting their obligations." The DCL provided the applicable framework for Title IX compliance through September 2017.

17. In September 2017, the Department of Education announced its intention to engage in rulemaking on the topic of Title IX, rescinded the 2011 DCL, and published a "Q&A on Campus Sexual Misconduct" to provide interim guidance for handling peer-on-peer sexual harassment and sexual violence.

18. Effective August 1, 2020, the Department of Education issued its "Final Rule." Having previously addressed the issues only through guidance documents, the Department's Title IX regulations now recognize that sexual harassment, including sexual assault, is unlawful sexual discrimination and have the force and effect of law.

19. The Title IX regulations set forth the requirements for a school's response to reports of sexual assault.

**The Regional University System of Oklahoma ("RUSO") Title IX Policy**

20. UCO is a member of the Regional University System of Oklahoma ("RUSO").

21. According to RUSO's "Title IX – Sex Discrimination, Sex-Based Misconduct and Sexual Harassment Policy," the system and its member universities "are committed to

4

providing an educational, living and working environment that is free from discrimination based on sex for all members of its community to include students, faculty, staff, contractors, and visitors… All members of RUSO are expected to adhere to the requirements of this Policy and the standards of each member university."

22. The "University Policy" page on UCO's website provides a link to the RUSO policy under the heading of Discrimination and Harassment.

23. The RUSO policy purports to provide the exclusive means for addressing reports of sexual harassment or sexual misconduct: "Alleged conduct reported pursuant to this Policy, whether or not the conduct constitutes a violation of this Policy, may violate other RUSO or university policies. The member university reserves the right to take disciplinary action for conduct reported under this Policy that constitutes a violation of any other university policy. If dismissal, suspension, or any other discipline of a faculty member or student is recommended as a result of a violation of this policy, the RUSO Title IX policy is the exclusive forum for such discipline and any appeals related thereto. The processes related to dismissal, suspension, or any other discipline set forth in RUSO policy Chapter 3 (Academic Affairs) and Chapter 4 (Student Affairs) and any related member university policies are superseded hereby and do not apply to faculty or students who have been found to have violated the RUSO Title IX policy and the discipline recommended as a result thereof."

**UCO's Title IX Policies and Equal Opportunity Statement**

24. UCO's Title IX Office defines Non-Consensual Sexual Contact as "any intentional sexual touching, however slight, with any object, with another person without the consent of that person." UCO recognizes Non-Consensual Sexual Intercourse as "any anal, oral,

5

or vaginal penetration, however slight, with any object, with another person without consent of that person."

25. UCO's 2021-2022 Student Code of Conduct reads, "Upon receiving a report of alleged violation of this Code, the Office of Student Conduct shall commence an investigation of the report. The designated investigator will advise each person identified in the report (each a "Party") of their rights, options, and resources available."

26. UCO approved the following Equal Opportunity Statement in 2015:

> The University of Central Oklahoma (University) is committed to an inclusive educational and employment environment that provides equal opportunity and access to all qualified persons. The University will continue its policy of fair and equal employment and educational practices without discrimination or harassment because of actual or perceived race, creed, color, religion, alienage or national origin, genetic information, ancestry, citizenship status, age, disability or handicap, gender, marital status, veteran status, sexual orientation, gender identity or expression, or any other characteristic protected by applicable federal, state, or local law. Discrimination or harassment in violation of this policy should be reported to the Affirmative Action Officer (Diane Feinberg, Assistant Vice President of Human Resources) in person at 204 Lillard Administration, or by phone at (405) 974-2658 or fax at (405) 974-3827. After office hours or on holidays, the report may be made by contacting University Police Services at (405) 974-2345.

## The Factual Background
## The University of Central Oklahoma

27. The University of Central Oklahoma ("UCO") is a public university with an undergraduate enrollment of approximately 14,000 students.

28. The UCO Chapter of the American Association of University Professors formed a Title IX Accountability subcommittee in response to issues and concerns raised regarding the Title IX office by UCO students, faculty, staff, and community partners.

29. In February 2021, the Title IX Accountability subcommittee penned a letter to UCO President Patti Neuhold-Ravikumar. The letter addressed several areas of concern, including the structure of the Title IX office and its relation to other university departments, the failure to clearly define the role of Title IX investigators and the absence of mechanisms for Title IX office accountability.

30. The Title IX Accountability subcommittee pointed out that the UCO Title IX had "made no effort to work with the Women's Research Center or other entities that represent diversity on campus." The subcommittee recommended that the Title IX office be moved from Student Conduct within the Division of Enrollment and Student Success "to one of these offices or have strong affiliations and a working relationship with equity and diversity centers on campus for the goal of authentic intersectional advocacy and support."

31. As support for the suggested move, the Title IX Accountability subcommittee highlighted the university's retention initiatives and offered an anecdotal example: "Indeed, one student who visited Title IX to report her sexual assault was encouraged to 'take a semester off' when she was concerned about her attacker on campus." Although not identified in AAU's letter, Plaintiff was that student.

32. The Title IX Accountability subcommittee identified specific serious concerns regarding UCO's Title IX Coordinator's ability to successfully support the UCO campus community. During its efforts to assist with victim's advocacy on the UCO campus, a

local community partner organization observed the following failures by the Title IX Coordinator:

- Failure to engage in trauma informed investigation techniques, instead requiring complainants to repeat their trauma over and over and sending triggering information via email,
- Failure to fully investigate complaints, instead deciding only one or two reported violations of the student code of conduct.
- Failure to ensure complainants are able to continue their education unimpeded.
- Failure to reach out to the victimized party when a mandatory reporter makes a report of a Title IX violation.
- Failure to follow through or enforce sanctions imposed.

33. The Title IX Accountability subcommittee advised the President that it was "extremely concerned" that the Title IX Coordinator did not provide faculty training and did not attempt to work with campus groups. Offers of support with advocacy and awareness from members of the Women's Research Center and BGLTQ+ Student Center were ignored and, at times, were met with hostility by the Title IX office.

34. The Title IX Accountability subcommittee reiterated its request that the students, staff, faculty be made aware of the reporting structure of Title IX, Title IX procedures, and ways to report potential violations. In particular, the subcommittee requested "clarification about the support faculty will get in a Title IX situation and what the procedures are for when faculty are involved in Title IX cases in any capacity."

35. UCO President Patti Neuhold-Ravikumar referred the AAUP Title IX Accountability subcommittee's letter to UCO General Counsel for response. The March 18, 2021 response largely avoided the specific concerns outlined the letter and instead provided an overview of Title IX and referred the faculty members to RUSO policy.

## The Sexual Assault and Report

36. Jane Roe travelled to the United States and enrolled as an international student at UCO

in the Fall of 2018. She received "A's" in her classes and was active in student organizations on campus during her first three semesters.

37. In the Fall of 2019, Roe met John Doe ("Doe"), a fellow international student and member of the International Student Council. Doe was employed on campus at the UCO student library technology desk. The two became friends. Roe and Doe were not, at any time, involved in a romantic relationship.

38. On March 22, 2020, Doe went to Roe's apartment for dinner. The two had drinks and Roe believes that Doe drugged her. Roe lost consciousness and drifted in and out of consciousness while Doe sexually assaulted her. Roe recalls that Doe placed his penis in her mouth, ejaculated on her chest and stomach, and digitally penetrated her vagina. She experienced pelvic pain the next day.

39. The next day, March 23, 2020, Roe informed her therapist of the sexual assault. That same night, Roe contacted UCO Professor Steven Dunn and told him that John Doe had sexually assaulted her.

40. On March 24, 2020, Roe contacted the UCO police department, who referred her to the Edmond Police Department. Upset and uncertain whether she wanted to pursue criminal charge, Roe did not provide the Edmond Police with John Doe's name. She did, however, follow the police officer's instructions to go to the emergency room for a SANE exam.

41. Professor Dunn reported Roe's assault to UCO's Title IX office on March 25, 2020.

42. Despite Dunn's report on March 25, 2020, no one in UCO's Title IX office contacted Roe. On March 31, 2020, a full week after Dunn's report, Roe reached out to the Title IX office herself. UCO Title IX Coordinator Paul Goertemiller ("Goertemiller") contacted Roe to arrange a phone call. No one from UCO's Title IX Office advised Roe

of her "rights, options, and resources" as required by UCO's policy.

43. On March 31, 2020, Roe filed an application for an emergency protective order with the Oklahoma County Court.

44. Roe's emergency protective order was granted, but the Oklahoma County Sheriff's Office informed her that they were unable to serve Doe because he had moved out of his on-campus housing. When Roe shared this with Goertemiller, he disregarded the information and made no attempt to help.

45. Throughout this period, Doe continued to text Roe and tried to contact Roe online. She continued to see Doe on campus regularly, which caused Roe to experience panic attacks.

46. Roe sought mental health treatment from a therapist twice a week following the assault and ultimately checked in to an in-patient trauma program during finals week in May 2020. Goertemiller advised Roe that he would notify her professors to let them know what was going on to ensure that her semester grades would not be negatively impacted. He failed to inform Roe's professors and likewise failed to inform Roe's therapist as he told Roe he would.

47. Goertemiller did not even speak with John Doe until mid-May 2020 – more than six weeks after the March 25, 2020 report to the Title IX office. The investigation did not even begin until the 60-day deadline for completion under UCO's policies had almost expired.

48. Roe shared with Goertemiller each instance of contact with Doe and explained the impact the interactions were having on her health. However, Goertemiller did not even suggest issuing a No-Contact Order until May 2020 and did not actually issue the Order until June 17, 2020 -- nearly three months after Roe's assault

## The Title IX Investigation and Outcome

49. On July 24, 2020 the Title IX Office issued an investigation outcome letter that finding Doe responsible for "non-consensual sexual contact" and mandating the following sanctions:

    - Two-year probationary period;
    - Completion of an online and in-person Title IX training course;
    - Two-year loss of student organization privileges;
    - Submission of on-campus work schedule to the Title IX office every semester and notification of any changes made to the schedule;
    - Continuation of the No-Contact Order through May 31, 2022.

50. Roe expressed confusion that Doe was not investigated for "Non-Consensual Sexual Intercourse," and was found responsible for a lesser offense, when Roe experienced non-consensual oral and vaginal penetration that satisfied the definition of intercourse under the University's policies. She was never provided an answer or explanation.

51. Goertemiller told Roe that he would send her the Title IX Office's Investigative Report on her case. After multiple requests by Roe's victim advocate for the document, Goertemiller shared only a draft of the report with Roe.

## Deliberate Indifference and Continuing Harm

52. In violation of the No-Contact Order and the Investigation Outcome Letter, Doe submitted his class schedule after the deadline and repeatedly submitted his weekly work schedules late, often qualified the schedules as "subject to change", or, some weeks, failed to submit them at all. As a result, Roe repeatedly saw Doe on campus and spent time nearly every week reminding Goertemiller to insist that Doe share his schedule.

53. In September 2020, Plaintiff met with Goertemiller to report an incident that occurred when she went to the library for a scheduled appointment at the technology desk. Although Doe had advised of Roe's appointment and instructed to leave the library area,

11

he did not comply. When Roe encountered him on her way into the library, she experienced a panic attack. Roe reported the encounter and the panic attack to Goertemiller, explaining that she believed that Doe's actions were intentional and that she felt unsafe.

54. Roe's victim advocate suggested multiple solutions for Doe's inconsistent communication of his schedule, such as implementing a work schedule that did not change on a weekly basis, relying on Doe's library supervisor to communicate the schedule, or imposing a penalty on Doe when he did not comply with his sanctions. Goertemiller did not acknowledge these requests.

55. Roe met with Goertemiller to discuss Doe's schedule in person and explained that the circumstances caused her to become fearful, unable to focus on her education, and had negatively impacted her grades. Goertemiller responded that he could look into refunding Roe for the semester if she would like to drop out.

56. Following the meeting with Goertemiller in which he suggested that she withdraw, Roe had an emotional breakdown. She began hyperventilating and was barely able to speak or breathe. She experienced suicidal ideation.

57. Doe continued to violate his sanctions and participate in the International Student Council and the Title IX Office did not enforce the penalty. In September of 2020, Roe suggested sharing the sanctions issued by the Title IX Office with UCO's Student Association ("UCOSA"), the body that manages the University's student organizations so that the student representatives would be aware of and potentially enforce the sanction. Goertemiller states that the University's General Counsel decided the sanctions could not be shared with UCOSA because it was part of the "University's record."

58. Roe appealed the sanctions issued by the Title IX Office and advocated for herself at the appeal hearing. UCO's Title IX Office curated a binder on behalf of Roe for the appeal hearing. Notably, the binder purported to include notes from each of Roe's meetings with Goertemiller, but the notes were inaccurate and incomplete. The notes omitted Goertemiller's suggestion that Roe leave UCO and seek tuition reimbursement and failed to reflect a telephone conversation and an in-person meeting.

59. On October 14, 2020, Goertemiller sent Roe a Final Outcome Letter that modified the sanctions imposed on Doe.

60. The modified sanctions required Doe to find a different job that would not impede Roe's ability to use the library. However, Doe remained employed at the library and was simply moved from the technology desk. Roe still encountered Doe at the library while he was at work. She remained fearful of seeing him and was unable to access and utilize the library resources.

61. The modified sanctions required that Doe undergo a mental health assessment to determine whether his continued enrollment posed a risk to the campus. Roe was never informed of the results of the assessment. She asked repeatedly, but Goertemiller refused to provide her any information.

62. Doe also continued to participate and hold leadership positions in student organizations on campus in which Roe was active – in direct violation of his sanctions. Doe was allowed to continue his membership in the President's Leadership Council, the university's most prestigious student organization until April 2021 – almost a year after he was found responsible for sexual misconduct.

63. Roe and Roe's victim advocate met with Rod Costner, UCO's Assistant Director of Student Conduct, to discuss the appeal's result. Roe, Costner, and Roe's victim advocate then met with Goertemiller to discuss the lack of enforcement of Doe's sanctions.

64. Roe pointed out that she recently reported an encounter with Doe outside the library, but nothing came of the report. First, Costner responded that Title IX Office investigated the wrong date, and therefore did not find any evidence of the encounter. Goertemiller then stated that he reviewed the library security camera footage that monitors the inside of the library, and told Roe there was nothing that he could do since the footage did not record her encounter with Doe.

65. Costner and Goertemiller advised Plaintiff that she bore the burden of proving that Doe was violating the sanctions. They told her that she should photograph her next encounter with Doe. Without this photographic evidence, they told her they would not investigate. Costner and Goertemiller did nothing to alleviate Plaintiff's fears and instead compounded the emotional distress she was experiencing. She retreated further into isolation.

66. Roe also inquired again about the finding that Doe committed "Non-Consensual Sexual Contact," and not "Non-Consensual Sexual Intercourse." Goertemiller dismissed her question and responded that the outcome of the investigation would not have changed, regardless of the charge against Doe.

67. Goertemiller was replaced as UCO's Title IX Coordinator by Erin Logan. Roe's victim advocate requested that Logan share Roe's Title IX file, including the recording of Roe's Appeal Hearing. Initially, Logan provided the necessary paperwork for a records request, but Logan later withheld Roe's file from her, citing "federal privacy laws." To date,

Plaintiff has been denied her own education records.

68. Upon information and belief, John Doe remains a student enrolled at UCO. Upon information and belief, based on Doe's entry date of Fall 2019, Doe is not expected to graduate until May 2023.

69. Roe expected to graduate from UCO in the Spring of 2022, but due to her declining mental health and, consequently, her educational performance, Roe deferred her graduation to 2024. As a result, Roe's F-1 Student Visa will expire prior to her graduation date. Roe has applied for a U-Visa, a visa for victims of criminal activity, but under this visa she may not leave the country to visit her family.

70. The No-Contact Order and sanctions imposed on Doe are set to expire May 2022. UCO has made no effort to extend the No-Contact Order, despite being on notice that Plaintiff's expected graduation has been delayed.

## DISCRIMINATION ON THE BASIS OF GENDER
## IN VIOLATION OF 20 U.S.C. § 1681
## (TITLE IX)

71. Plaintiff incorporates all paragraphs of this Complaint is if fully set forth herein.

72. UCO's acts and failures to act amounted to unlawful sexual harassment and discrimination on the basis of sex. The harassment and discrimination Plaintiff suffered was sufficiently severe and pervasive to create an abusive, and sexually hostile educational environment for Plaintiff. One or more UCO administrators or officials, with authority to take corrective action on Plaintiff's behalf, had actual notice of said harassment and discrimination and failed to adequately respond, in violation of their own policies. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur.

As a result, Plaintiff was made vulnerable and subject to continuing harassment and loss of educational opportunities.

73. Defendant maintained a policy of indifference to sexual misconduct, including sexual harassment, on campus by failing to comply with and enforce its own policies and procedures.

74. Defendant's policy of indifference created a heightened risk of sexual harassment on campus that was known and/or obvious to Defendant. Sexual misconduct between students was ignored and perpetrators were empowered and emboldened to operate with impunity without fear of consequence. The heightened risk created by UCO's actions and inactions was realized when Plaintiff suffered sexual harassment and sexual abuse perpetrated by another UCO student.

75. UCO failed to enact and/or disseminate and/or implement proper or adequate procedures to discover, prohibit or remedy the kind of gender-based discrimination that Plaintiff suffered.  This failure included, without limitation, non-existent or inadequate customs, policies or procedures for the recognition, reporting, investigation and correction of unlawful gender-based discrimination. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur.  As a result, Plaintiff was made vulnerable and subject to continuing harassment and loss of educational opportunities.

76. Defendant knowingly and deliberately concealed the breadth of the problem of sexual misconduct on its campus. Prior to the assault and harassment suffered by Plaintiff, UCO had actual knowledge that sexual misconduct, sexual harassment and gender discrimination was widespread on its campus.

77. Defendant failed to train its employees with respect to detecting, preventing and responding to sexual misconduct. Defendant failed to train its students with respect to identifying sexual misconduct, preventing its occurrence and reporting its occurrence.

78. As a result of UCO's discrimination and deliberate indifference, Plaintiff has suffered loss of educational opportunities and/or benefits.

79. Plaintiff has suffered and continue to suffer severe emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, and has incurred and will incur expenses for medical and psychological treatment, therapy and counseling.

80. Plaintiff has incurred, and will continue to incur, attorney's fees and costs of litigation.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays for damages; costs; interest; statutory/civil penalties according to law; attorneys' fees and costs of litigation, pursuant to 42 U.S.C. §1988 or other applicable law; and such other relief as the court deems appropriate and just.

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS

Dated:  March 21, 2022                                    Respectfully submitted,

                                                          */s/ Sheila P. Haddock*
                                                          Sheila P. Haddock
                                                          Attorney- in- Charge
                                                          Texas State Bar No. 00790810
                                                          sheila@zalkin.com
                                                          THE ZALKIN LAW FIRM, P.C.
                                                          10590 W. Ocean Air Dr., Ste. 125
                                                          San Diego CA  92130
                                                          Telephone: (858) 259-3011
                                                          Facsimile: (858) 259-3015

                                                          *Attorneys for Plaintiff*